(C.D. 4120)

C. TENNANT SONS & Co. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided November 9, 1970)

*Sharretts, Paley, Carter & Blauvelt* (*Gail T. Cumins* of counsel) for the plaintiff.
*William D. Ruckelshaus,* Assistant Attorney General (*John A. Winters,* trial attorney), for the defendant.

Before RAO, FORD, and NEWMAN, Judges

RAO, Chief Judge: The merchandise involved in this case, imported from Hong Kong, is described on the invoice as 52 percent polynosic and 48 percent cotton duck in the greige, in chief value of cotton. It was assessed with duty at 17½ per centum ad valorem under item 328.12 of the Tariff Schedules of the United States, as woven fabrics in chief value of cotton containing man-made fibers, not fancy or figured, colored, whether or not bleached. It is claimed to be dutiable at 13 per centum ad valorem under item 326.12 as woven fabrics in chief value of cotton, containing man-made fibers, not fancy or figured, not bleached or not colored.

The pertinent provisions of the tariff schedules are as follows:

Woven fabrics, in chief value, but not wholly,
of cotton :
Containing (in addition to cotton) silk
or man-made fibers, or both, but not
containing other fibers :
Not fancy or figured :

| | | |
|---|---|---|
| 326.12 | Not bleached and not colored__ | 10.50% (base rate) +2.5% ad val. |
| | *  *  *  *  *  *  * | |
| 328.12 | Colored, w h e t h e r or not bleached _____ | 10.50% (base rate) +7% ad val. |

At the trial, counsel for both parties stated that the issue was whether or not the imported merchandise was colored within the meaning of the tariff schedules. In its brief defendant claims in addition that there was no showing that the merchandise was not bleached. Although there is no direct statement in the record that the goods were not bleached, the description of the processes applied prior to shipment, the statements that the merchandise was greige cloth and that greige cloth is unbleached, and the testimony that the merchandise must be bleached and otherwise processed in order to be merchantable are sufficient to establish *prima facie* that the merchandise had not been bleached prior to importation.

The issue then is whether in its imported condition the merchandise was "colored" within the statutory definition of that term which reads as follows (schedule 3, headnote 2(b)) :

> (b) the term *"colored"*, as used in connection with textile materials or textile articles, means that they have been subjected to a process such as, but not limited to, dyeing, staining, painting, printing, or stenciling, in which color is imparted at any stage of manufacture to all or part of the fiber, yarn, fabric, or other textile article, except identification yarns and except marking in or on selvages;

Plaintiff called five witnesses who have had extensive experience in the textile field:

Y. T. Wong, vice-president of Luckytex, Ltd., the New York sales office of Textile Alliance Limited of Hong Kong, and who at the time of importation was mill manager of Great Eastern Textile and assistant production manager of Textile Alliance, an affiliated company, and had direct supervision of the manufacture of the imported merchandise.

Paul Goldberger, manager of the Textile Import Department of C. Tennant Sons & Co., the plaintiff herein, whose function is to buy and sell the piece goods handled by his company.

Frank Dickstein who has been in the business of dyeing and finishing textiles since 1933 and is president of Arcola Fabrics Corp., which purchased the within merchandise from plaintiff.

Thomas R. C. Hood, chairman of Thomas R. C. Hood & Co., Inc., consultant in the textile field, who had been employed by Cone Mills for 27 years and had been a director of Cone Mills Corporation, the parent company, one of the largest manufacturers of textiles in America, since 1962.

Alfred Carter, who has been employed by ICI America, Inc., textile, chemical and dyestuff manufacturers for 19 years, and has been textile chemist demonstrator for 10 years.

Their testimony may be summarized as follows:

The merchandise involved herein is made of raw cotton, a natural fiber, and polynosic fiber, a man-made fiber of regenerated cellulose. The first thing that is done to the polynosic fiber is to tint it with a fugitive tint in order to identify the particular batch during processing in the mill and also to identify the yarn which is made from the fiber and the cloth made with the yarn. The cotton fiber and the polynosic fiber are then processed separately into rope form. In that form, the materials are stretched, drawn, mixed and spun into yarn after which the blended yarn is woven into cloth. The product is known as greige cloth, which means cloth in the loom state, unbleached, unprocessed, uncolored, and unprinted.

The term "fugitive tint" is used within the industry in the mill itself. It means a non-permanent coloring which will wash out easily in any normal wet processing, such as scouring or bleaching. It will also fade if exposed to sunlight. It has no effect on the processes of spinning and weaving, or on the physical properties of the yarn or cloth, and is very cheap. Portions of exhibits 1 and 1-A were immersed in a solution of soap and water during the course of the trial. When the pieces were removed, the fugitive tint had disappeared.

The tints applied to the imported merchandise consisted of Solway Blue, Naphthaline Scarlet, and Lissamine Green, dyestuffs of the acid type which when applied to a cellulosic fiber function as fugitive tints which can be removed easily when subjected to a wet treatment. They are used only for identification purposes.

It is common practice, both in this country and overseas to use fugitive tints for the purpose of identifying yarns at the mill level when the mill is producing more than one blend of fabric. Different colors are used to identify different batches of fiber. Mills weave polynosic, dacron, rayon, nylon and other fibers and fugitive tints are used to prevent the possibility of a piece of cloth being woven with the wrong fiber and to avoid confusing one yarn with another in the weaving process. This is important because every man-made fiber has a different index of dyeing or shrinking and if a foreign fiber gets in, the material will dye differently.

Two of the witnesses, Mr. Wong and Mr. Hood, were familiar with the term "identification yarns." Mr. Wong testified:

> There are two different types of identification yarns. Number one, this is one type of yarn, identification yarn which is inserted in the piece goods or in the cloth, only one or two in the cloths, just to identify the construction of the cloth. And number two, there is another kind of identification yarn, which as we used in this particular cloth, and this identification yarn is tinted with fugitive tints to identify the batch of the fiber, to identify the yarn which is made of two different fibers, and to identify the cloth

which is made of this particular blend yarn, in addition to the construction of the cloth.

Mr. Hood stated:

In addition to identifying greige cloth for mill purposes, there is also identification yarn woven in the selvedge of a denim within a mill. Denims are sold in different weights. Now, it is quite difficult, it all looks the same in the mill, so in the selvedge of the cloth when it is being drawn, you may have one or two strands of vat dye to identify it within the mill.

Q. But both identification such as in Exhibit 1 and 1–A and the selvedge type of identification are identification yarns, in your opinion?—A. Identification; not decorative at all.

Mr. Hood also said that the fugitive tint does not identify the fabric but the fact that there is a man-made fiber present.

Mr. Goldberger testified that he had purchased the merchandise on behalf of plaintiff and sold it to Arcola Fabrics as single filled duck in the greige, unfinished and unbleached. The fact that the goods were fugitively tinted did not affect the sale.

There was also testimony that the merchandise involved herein was greige goods which must be scoured, bleached, dyed, colored or printed to be commercially usable; that cloth which is offered for sale in the United States as colored cloth has a reasonable degree of color fastness, and that the instant merchandise was colored for identification only and was not sufficiently color fast for practical use. Fugitive tinted cloth is not offered for sale in the United States as colored cloth. Colors, dyes, and stains are reasonably permanent and can be removed only by additional processing, such as bleaching. Some colors cannot be removed at all. Fugitive tint is applied to material before it is woven into a fabric whereas dyes or colors are normally applied after the fabric is woven.

Defendant called two witnesses: George Robert Turner, who had been employed by E. I. du Pont for 28 years and was then supervisor for dye application research and development, and Moses P. Epstein, who has been in the textile trade for 54 years, including 22 years as vice-president in charge of marketing for Industrial Rayon Corporation and before that in the manufacture of fabrics at Slater Mills, and who at the time of trial was self-employed as a consultant.

These witnesses testified that the term "identification yarn" means a colored yarn which becomes part of the finished product and is used for the manufacturer's identification of the cloth to distinguish it for quality reasons or to make sure that he is not faced with a claim as to a fabric not of his making.

Defendant's witnesses also stated that the term "batch material identification" relates to coloring applied to textile materials in a

manufacturing plant to identify the particular batch or fiber as it is processed through the mill. Fugitive tints which are later removed during the wet finishing operation are used for this purpose. They are not used on identification yarns as they would not carry through to the finished product.

It is clear from the record that some of the fiber of which the imported cloth is made was in fact tinted prior to manufacture and that the fabric as imported possesses a tint or color. The question is whether such tint, denominated a fugitive tint, is to be disregarded for tariff purposes.

In determining the meaning of the term "colored" as far as this merchandise is concerned, our first consideration is the definition of that term in headnote 2(b), schedule 3, *supra*. That definition is a broad one, indicating that a textile material or article is to be considered "colored" for tariff purposes if it has been subjected to a process, such as, but not limited to, dyeing, staining, painting, printing, or stenciling, by which color has been imparted at any stage of manufacture to all or part of the fiber, yarn, fabric or article, except identification yarns or marking on selvages. In the instant case, color was imparted to one of the fibers at the initial stage of manufacture and remained in it while it was processed into rope form, blended with another fiber, and woven into the imported cloth.

Plaintiff claims in the first instance that the exception for "identification yarns" is applicable. The statute does not define this term, and the evidence presented, which is advisory only, is conflicting. Plaintiff's witnesses testified that there were two types of identification yarns, one consisting of one or two strands of yarn inserted in the cloth or the selvage just to identify the cloth and the other consisting of yarn or fiber which is tinted with a fugitive tint to identify the batch of fiber and the yarn and cloth made therewith. Defendant's witnesses, on the other hand, limited the term "identification yarn" to a colored yarn which becomes part of the finished fabric and applied the term "batch material identification" to fibers colored with fugitive tints to identify the batch as it goes through the mill.

The definitions given by defendant's witnesses are more precise, but the question remains as to the meaning intended by Congress. For light on that intent we turn to the Tariff Classification Study of November 15, 1960 which was before Congress prior to the enactment of the tariff schedules. It contains the following (Schedule 3, p. 5):

> Headnote 2(b) defines the word "colored" to include numerous terms, such as "colored", "dyed", "printed", and "stained" which are used indiscriminately in the existing provisions. The proposed definition continues the present customs practice of ignoring color introduced as identification markings, as, for example, a colored

yarn in a selvage or elsewhere for identifying the type or grade of the fabric.

According to this statement, it is evident that the term "identification yarns" includes a strand or two of colored yarn in a selvage or other part of the fabric for identifying its type or grade. Whether or not it includes anything else is not as clear.

No evidence has been introduced to show what the "present customs practice" was.

Defendant relies on cases under former tariff acts, holding that cloth colored with a fugitive tint was classifiable as colored cloth. *Heyliger & Raubitschek* v. *United States*, 11 Ct. Cust. Appls. 90, T.D. 38735 (1921), and *Mills & Gibb Corp.* v. *United States*, 57 Treas. Dec. 1077, Abstract 11008 (1930), aff'd on other grounds, 18 CCPA 224, T.D. 44403 (1930). In the case first cited, the cloth was woven with a double twisted yarn for the warp and a single twisted yarn for the filling. The warp yarn, before weaving, was treated with a fugitive tint solely for the purpose of assisting the weaver in distinguishing between the two yarns. The tint was temporary and would disappear in the process of bleaching or dyeing, or if the cloth were washed in soap and water or exposed to the sun for a few days. The tint added nothing to the market value or usefulness of the cloth and was invariably removed before being put to final use by a consumer. The court stated (pp. 92–93):

> We therefore conclude that at the time of importation the cloth in question was actually colored cloth within the common acceptation of the term, and the only question which remains is whether its assessment as such should be reversed because of the explanations above set out concerning the manufacturer's object in coloring the warp yarns as aforesaid, and the temporary and incidental character and purpose of the color as part of the fabric.

> The question we think must be answered in the negative, for the collector was bound to ascertain the condition of the cloth in respect to color by inspection at the time of its importation and to classify it in this particular according to its characteristics at that time, and since it was then colored its assessment as colored cloth was correct, notwithstanding the fact that the color was not permanent and did not add to the market value of the article. The tariff provision in question prescribes but a single criterion in this particular, and that is whether the cloth is colored or not at the time of its importation. If so, it becomes dutiable as colored cloth, regardless of the means or motive with which it was colored, or the subsequent history of the article as intended by the importers.

In *United States* v. *Bryant & Beinecke*, 10 Ct. Cust. Appls. 79, T.D. 38355 (1920), unbleached cotton duck having a single blue warp thread running lengthwise through the fabric, about an inch from each edge,

serving only as a marginal guide in making the fabric into sails, tents, and tarpaulins, was held classifiable as uncolored on the ground that in order to fall within the provision for colored cotton cloth, "it must be cloth having colored yarns or threads which form a necessary and *substantial* part of the article." [Emphasis quoted.]

Subsequently, in *Bemis Bro. Bag Co.* v. *United States*, 11 Ct. Cust. Appls. 373, T.D. 39162 (1922), jute padding uncolored except for two stripes composed of six warp threads each, blue or red in color, about ¼ inch from the selvage and running lengthwise through the piece, which stripes served the purpose of identifying the class of cloth, was classified as colored. The same result was reached in *Balfour, Williamson & Co.* v. *United States*, 11 Ct. Cust. Appls. 368, T.D. 39161 (1922), as to cloth uncolored except for two blue stripes of four warp yarns each, about an inch from either edge, which stripes served as a guide in sewing. In the *Bemis* case, the court noted (p. 378):

> We have not overlooked the fact that it has been an administrative practice in the customs service since the enactment of the tariff act of 1913 to classify goods of this character as not colored and as entitled to free entry consistently with the claim made by the importer herein. That practice, however, was in contravention of the law, as we understand it, and it should not be given a controlling effect in the case. * * *

See also *Thornley & Pitt* v. *United States*, 5 Cust. Ct. 169, C.D. 393 (1940); *C. R. Daniels, Inc.* v. *United States*, 16 Cust. Ct. 83, C.D. 989 (1946); *F. Powers Co., Inc., et al.* v. *United States*, 57 Cust. Ct. 233, C.D 2772 (1966).

It therefore appears that under prior tariff acts, and presumably under prior customs practice, cloth with more than one or two strands of colored yarn was considered to be colored for tariff purposes.

In view of the foregoing, we are of opinion that the term "identification yarns" as used in headnote 2(b) of schedule 3 of the tariff schedules, *supra*, refers to a strand or two of colored yarn inserted in a fabric for identification purposes and not to colored yarns which form a substantial part of the fabric, whether or not the color is temporary or for identification purposes only.

Plaintiff's second argument is that fugitive tinting is not a "process such as, but not limited to, dyeing, staining, painting, printing, or stenciling" on the ground that it is not permanent and does not affect the value, nature or condition of the fabric, and that therefore cloth so processed does not come within the definition of "colored" in headnote 2(b) *supra*. However, a reading of the headnote in its entirety discloses that the characteristic of the processes which Congress regarded as significant for the purpose of the definition was the impartation of color during any stage of manufacture. The rule of *ejusdem*

*generis*, if applicable at all, is thus limited to that single controlling resemblance. *Gallagher & Ascher et al.* v. *United States*, 6 Ct. Cust. Appls. 105, T.D. 35343 (1915). There is no doubt that the fugitive tint imparts color and that as imported the merchandise has color. Whether that color is as permanent as or of as good quality as one bestowed by the processes enumerated is not material. While there may be differences between fugitive tinting and the processes enumerated in method and time of application and in effect on the cloth, the criterion in the definition is the impartation of color during any stage of manufacture to all or part of the fiber, yarn, or fabric. The imported merchandise meets this requirement and must therefore be regarded as "colored" for tariff purposes.

For the reasons stated, we find that the merchandise herein was properly classified as colored woven fabrics in chief value of cotton containing man-made fibers, not fancy or figured, under item 328.12 of the tariff schedules. The protest is overruled and judgment will be entered for the defendant.